IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

IN RE:  CELESTA K. LAWSON, DEBTOR                    CASE NO.: 5:18-bk-13620
                                                     CHAPTER 13

CELESTA LAWSON                                       PLAINTIFF

V.                          AP NO.: 5:18-ap-01079

LINDA SHEHAN                                         DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**</u>

Celesta K. Lawson, the debtor ("debtor"), filed her *Complaint for Turnover and Contempt, Conversion, and to Determine Extent Validity of Lien* ("Complaint") on July 26, 2018.  After the time to file an answer had run without a response, the debtor filed a *Motion for Default Judgment* ("Motion") on October 30, 2018, at docket entry 7.  The court set the Motion for hearing on January 24, 2019.  The debtor appeared personally and through her counsel; the defendant, Linda Shehan ("Shehan"), appeared pro se.  The court held a trial on the merits without objection and pursuant to Federal Rule of Bankruptcy Procedure 7055.  At the conclusion of trial, the court took the matter under advisement.  For the reasons stated herein, the concurrent relief requested in both the Motion and Complaint is denied.

## I.  Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(C), (E), and (K).  The following opinion and order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Background

The Complaint is initially straightforward.  The debtor alleges that she filed her Chapter 13 bankruptcy on July 5, 2018.  (Compl., at ¶ 1.)  Prior to her filing, on July 3, 2018, Shehan "repossessed" the debtor's 2011 Toyota Corolla ("Corolla").  (Compl., at ¶ 4.)  The debtor subsequently informed Shehan of her bankruptcy proceeding, and Shehan initially refused to return the vehicle based on advice of counsel.  (Compl., at ¶ 6.)  Shehan later returned the Corolla on July 21, 2018, but "several items of personal property and the license plate were missing."  (Compl., at ¶ 7.)  So far, this is a classic case of a secured creditor repossessing collateral, a motor vehicle with valuable contents, and failing to fully account for the same after bankruptcy is filed.

The debtor, however, is apparently conflicted over her exact contractual and legal relationship with Shehan.  Specifically and yet ambiguously, the Complaint references Shehan as both a "secured creditor" to be paid in full and one to whom "no debt" is owed with no collateral and no payment.  (Compl., at ¶ 10.)  Specifically,

> That, pursuant to [the debtor's] Narrative Statement of Plan, [Shehan] is a secured creditor and provisions are made therein to pay the full any debt on the vehicle in question but there is no debt on the vehicle only a lien which was placed on it without [the debtor's] knowledge or permission when she was married to [Shehan's] son and when [Shehan] loaned money to her son. There is no writing evidencing a debt owed to [Shehan] by [the debtor].

(Compl., at ¶ 10.)[1]

---

[1] The debtor filed her first Chapter 13 Plan (the "First Plan") the day she filed bankruptcy, July 5, 2018.  The First Plan listed Shehan's treatment as secured and requested a section 506 valuation of the claim.  Linda Shehan is the creditor listed with the collateral, a 2011 Toyota Corolla, valued at $5,000.  The estimated claim or debt is $0.  On August 16, 2018, the Chapter 13 Standing Trustee ("Trustee") objected to the plan, citing that the debtor had "failed to notice all parties pursuant to FRBP 3015(d)," and that "the plan provisions regarding the claim of Linda Shehan are unclear."  (Trustee's Objection to Confirmation of Plan, Aug. 16, 2018, ECF No. 17.)  On October 5, 2018, the Trustee settled his objection with the debtor to modify the First Plan.  On October 22, 2018, the debtor filed her second Chapter 13 Plan (the "Second Plan").  The Second Plan states the reason for the amended plan as "Notice all creditors; Update creditor Linda

2

Consonant with the debtor's assertion that she had not known or consented to the imposition of a lien, the debtor also alleges in her Complaint that Shehan transferred the car title to Shehan's name, notwithstanding that Shehan "did not have any legal authority to transfer the title." (Compl., at ¶ 9.)

The debtor's Complaint alleges three causes of action against Shehan: (1) that Shehan converted the debtor's personal property; (2) that Shehan should be held in contempt for violating this court's automatic stay order; and (3) that the court should order Shehan to transfer title to the Corolla back to the debtor. At trial, debtor's counsel withdrew any issues concerning the Corolla or the title, as Shehan returned the vehicle and made the necessary transfer before trial. Thus, the remaining issues revolve solely around the items of personalty, not specifically described in the Complaint, supposedly in the Corolla when repossessed by Shehan, for which the debtor now seeks damages, including contempt.

### III.   Findings of Fact

Stated succinctly, the debtor's position is that she borrowed no money from Shehan on the Corolla, that she granted Shehan no lien, that Shehan had no right to repossess her Corolla or transfer title, and that valuable contents were missing upon return. Shehan admits a few items, but contends that she gave back everything she saw or knew to be in the vehicle. (Trial Trans., Jan. 24, 2019, ECF No. 14, at 24.) The two directly conflicting versions are unreconcilable. Resolution requires context, convincing exposition, corroboration—direct or inferred, and a measured

---

Shehan." (Debtor's Amended Plan, Oct. 22, 2018, ECF No. 26, at 1.) Under the Second Plan, Shehan's claim was no longer listed as a secured claim; instead, under Nonstandard Plan Provisions the debtor states "Linda Shehan's secured lien on the 2011 Toyota Corolla has been released and amount owed to creditor is $0.00." The time to object to the plan ran without response, and the court entered its order confirming the debtor's Second Plan on November 13, 2018. An order to appear and show cause may issue as a result of this plan treatment.

assessment of credibility.  In this instance, these factors weigh heavily and almost exclusively in favor of Shehan.

### 1.   Loan to the Debtor

A close examination of the record exposes the debtor.  First, a loan exists, and it was a loan from Shehan to the debtor.  Specifically, by check dated March 13, 2016, Shehan paid off an approximate $5000 balance owed by the debtor on the debtor's Corolla.  (Tr. Trans., at 20–21.) Shehan testified that she and the debtor had a verbal agreement, stating, "[s]he did not—it was verbal that they, you know, was going to pay me back for the car, because she was having trouble paying her car payment, she couldn't even pay her credit card payments."  (Tr. Trans. at 14.) Further, Shehan testified that "[the debtor] had only paid 750 [back to Shehan] on the car when [the debtor and Shehan's son] went their separate ways."  (Tr. Trans. at 13.)  Also,

> And with that amount that was—she's asking for, may be true, you know, in her mind, but the car—she knew what she owed on the car. She had only paid 750 on the car when they went their separate ways. And I did pay off the car. And she would not have signed me to be lienholder if she did not know that she owed for that car. Yes, she was with my son, but she's a grown woman, and she signed that. So, she knew that she still owed me 5,000 some odd dollars on that car. And I asked her to make a payment and she never attempted to make a payment, not one payment.

(Tr. Trans. at 13.)  Shehan offered the only testimony on this issue; the debtor did not address or contradict Shehan's testimony in any way regarding a verbal agreement whereby Shehan extended a loan to the debtor to pay off her debt on her Corolla.

### 2.   Security Agreement From the Debtor

Second, the debtor alleged in her Complaint that she did not grant Shehan a lien and testified in court that she did not know how Shehan got title to the Corolla transferred to her name. (Compl., at ¶ 10; Tr. Trans. at 8.)  In fact, there is a security agreement signed by the debtor, not her husband.  (Tr. Trans. at 15; Shehan's Ex. A.)  Shehan's Exhibit A is a *Security Agreement*

4

*(Motor Vehicle)* ("Security Agreement") dated May 24, 2016, shortly after Shehan paid off the debtor's debt on the Corolla.  (Tr. Trans. at 14–15.)  The Security Agreement describes the Corolla and is signed by the *debtor* as "debtor(s)."  (Shehan's Ex. A.)  Further, Shehan obtained possession of the title to the Corolla after she paid off the debtor's debt.  (Tr. Trans. at 21.)  Again, only Shehan elucidated this issue or the existence of the Security Agreement with the debtor's signature thereon; the debtor neither addressed nor contradicted Shehan's testimony.

### 3.   The Contents

Remaining is the issue of the list of supposedly unaccounted for items.  Juxtaposed against Shehan's proof, the debtor's testimony and proof lacked corroboration, compelling exposition, or sufficient credibility.  The debtor introduced a list and testified that the following items were in the Corolla when repossessed and were missing upon return.

| | |
|---|---|
| Personalized license plate | $55.00 |
| Baggo set | $150.00 |
| Ariat boots | $185.00 |
| Spare tire | $100.00 |
| Born dress shoes | $125.00 |
| 2 gold bracelets | $225.00 |
| 1 inch belt buckle ring | $175.00 |
| Dress pants | $200.00 |
| Blouses | $175.00 |
| Jeans | $150.00 |
| Leggings | $125.00 |
| 3 purses | $150.00 |
| Shoes | $225.00 |
| Nike jacket | $90.00 |
| | $2,130.00 |

(Pl.'s Ex. A.)  Below is the extent of the debtor's testimony concerning the above list on direct examination by her counsel, Mr. Bueker, which lacked compelling and supporting exposition.

**Bueker:**  Okay. But, at some point, she gave it back; I believe it was July the 5th?
**Debtor:**  Yes, sir.
**Bueker:**  And upon her giving it back, did you notice that there were some things missing out of the car?

5

**Debtor:**  Yes.

**Bueker:**  Did you make a list of those things?

**Debtor:**  Yes.

**Bueker:**  I'm going to show you what's been marked as [debtor's] Exhibit A. I don't know how to make this zoom in or out. Is this a list that you made?

**Debtor:**  Yes, sir.

**Bueker:**  And is this—are these things that were in the car when she took it?

**Debtor:**  Yes, sir.

**Bueker:**  And when you got the car back, were these things in there?

**Debtor:**  No, sir.

**Bueker:**  Just go down the list briefly. What's the first thing on the list?

**Debtor:**  The personalized license plate, a Baggo set, some Ariat boots that belong to Mr. Manus, my spare tire, Born dress shoes, two gold bracelets, it's a gold belt buckle ring, dress pants, some blouses, jeans, leggings, some purses, shoes, and a Nike jacket.

**Bueker:**  You've placed a value next to each of these things. Where did you arrive at those values?

**Debtor:**  Of what it would cost to replace them.

**Bueker:**  The total of those items is 2,130 dollars?

**Debtor:**  Yes, sir.

(Tr. Trans. at 8–10.) That is the full extent of the debtor's testimony regarding the items. In sum, "*there*," then "*not there*."

Conversely, Shehan was qualitatively and persuasively more expositive. In the first instance, she did not act in haste, suddenly or vindictively, to repossess the car. Despite payment of only $750 over a two-year period, Shehan did not actively pursue collection of the debt or collateral. With respect to the debtor, Shehan demonstrated no animosity whatsoever. Shehan testified:

> But I was just trying to show her that, you know, people will repossess your car if you don't make your car notes. And so, I took it back. Because I love her to death and, you know, I hate that this happened. It just kind of got out of hand is what happened. But I do need my money. And, you know, whatever she could pay a month would be—I'd be grateful. And that's really all I have to say about it.

(Tr. Trans. at 14.) Nor is there any indication of favoritism with respect to her son, the debtor's husband or soon to be ex-husband, about whom Shehan testified:

**Bueker:**  Your son is Ms. Lawson's husband or soon to be ex-husband?

**Shehan:** Yes. Yes.
**Bueker:** Okay. Tell us about him.
**Shehan:** He's been in a lot of trouble. He's done a lot of things—
**Bueker:** Been in trouble—
**Shehan:** —that I'm not proud of.
**Bueker:** Been in trouble with the law?
**Shehan:** Oh, yeah, he has.
**Bueker:** Would you put it past him to take some of Ms. Lawson's things?
**Shehan:** I asked him and I looked and I searched his truck and I looked everywhere I knew to look, and I didn't find anything. Because, you know, I wouldn't put it past him. That's the reason I searched around, looking.

(Tr. Trans. at 25–26.)

Equally, Shehan credibly testified that when she repossessed the Corolla she loaded everything inside the car into a white trash bag that she placed in the trunk and, with a few exceptions outlined below, never saw or had custody of any of the other items on the list. Specifically, she found "some leggings, some black shoes, a black coat, a couple pieces of jewelry, some flip-flops, [and] the tags for the car." (Tr. Trans. at 6–7.) She also admitted to seeing the tire in the trunk. Shehan testified that nothing else was in the car but the items she returned, and that she did not keep any of the debtor's property. Shehan did not argue that the debtor was lying; rather, she contended that she did not see anything else in the car and that if there were other items that she does not know what happened to them.

Additionally and significantly, it appears the debtor deliberately avoided her best chance to directly deal with Shehan about any contents when Shehan returned the vehicle. Specifically, Shehan had a family member follow her in their car to a gas station where she intended to surrender the Corolla back to the debtor. While Shehan was in the bathroom, the debtor took the car without any discussion, inventory, accounting, or other effort to directly address Shehan. (Tr. Trans. at 10, 17.) That purposefully avoided meeting would have been the best opportunity to make sure everything was in place and discuss any missing items. Also, even as the debtor drove off while

7

Shehan was in the bathroom, it should not have been difficult for the debtor to immediately discern that supposedly over $2100 in items were missing from the inside of a corolla. Further, it was not until a few weeks after Shehan returned the Corolla that she heard anything from the debtor about any missing items. (Tr. Trans. at 22–23.)

Shehan admitted at trial that she thereafter lost the key she used to drive the Corolla to the gas station and estimated its replacement value at $300. (Tr. Trans. at 16.) Debtor's counsel in closing asked for additional damages in that amount. (Tr. Trans. at 27.) That request belies two things: (1) the debtor in neither her Complaint nor testimony ever mentioned the key, and (2) had the debtor lingered long enough to let Shehan get out of the bathroom, she would have gotten her key. Shehan should not be held responsible for the key after that point.

The record is also unclear as to when the vehicle was returned. The Corolla could have been returned on July 21, 2018, as alleged in the Complaint. (Compl., at ¶ 7.) This date arguably comports with both parties' testimony because both allude to a passage of time between the repossession and return. However, July 5, 2018, was offered at trial as the date of return by debtor's counsel and the debtor agreed through her testimony. (Tr. Trans. at 8.) As a result, the court echoed the July 5 return date on three different occasions and Shehan agreed, with no objection from the debtor. The court believes the debtor made a genuine mistake. July 5 is the same day the debtor filed bankruptcy and is only two days after the date of repossession. Ultimately, however, the record does not support a determination of the exact date of return.

Shehan's testimony was detailed, convincing, and highly credible. The court was left with bare statements by the debtor on one side and factually supported counter-assertions by Shehan on the other. Under these circumstances, Shehan's account was simply more credible. Shehan returned all that she repossessed.

### IV.  Discussion

The debtor seeks: (1) return or damages for conversion of her personal property and (2) contempt for a violation of the automatic stay order.  Although the debtor seeks damages for contempt, the Complaint uses stay violation language to support such an award.  Thus, both paths, contempt and willful violation of the stay, are addressed as potential avenues of recovery.

### 1.  Conversion

The Complaint alleges conversion of the personal property left in the Corolla.  "Under Arkansas law, conversion is any distinct act of dominion wrongfully exerted over property in denial of, or inconsistent with the owner's rights."  *Nat'l Hydro-Vac Indus. Servs. v. Fed. Signal Corp.* (*In re Nat'l Hydro-Vac Indus. Servs., L.L.C.*), 314 B.R. 753, 761 (Bankr. E.D. Ark. 2004) (citing *McQuillan v. Mercedes–Benz Credit Corp.,* 331 Ark. 242, 247 (1998)).  To hold Shehan liable for conversion, the debtor must prove that "1) [she] owned or was entitled to possess the personal property, and 2) [Shehan] intentionally took or exercised dominion or control over the personal property in violation of the [debtor's] rights."  1 HOWARD W. BRILL, ARKANSAS LAW OF DAMAGES § 33:7 (2018) (alteration in original).

The debtor, however, has not proven that Shehan converted any personal property.  The only evidence offered to substantiate that the specifically listed items *were* in the vehicle is the debtor's own self-serving testimony, which Shehan disputed and which lacked exposition, corroboration, and credibility.  *Carpenter v. Layne*, 374 S.W.3d 871, 877 (Ark. Ct. App. 2010) (noting that "[d]isputed facts and determinations of the credibility of witnesses are within the province of the factfinder.").[2]

---

[2]  The debtor claims she owned the missing property, valued at $2,100, but her schedules do not reflect any such ownership. The only property items listed in the debtor's Schedule A/B are: (1) the Corolla ($5,000); (2) Household goods ($600); (3) Clothing ($200); and (4) "Various"

9

The debtor's sparse testimony, condensed to *the items were there and then not there*, is not enhanced by the easily refuted allegations that Shehan had not loaned her any money nor had the debtor granted Shehan a lien on the Corolla.  The unrefuted testimony is that Shehan paid off the debtor's debt on the debtor's Corolla and that the debtor granted solely and specifically a lien to Shehan on the very same vehicle.  The Complaint is wholly inaccurate in both regards.  The debtor's story also lacks exposition and context when compared to Shehan's.  Shehan's uncontradicted testimony reflected a history of Shehan's efforts to help the debtor, the debtor's lack of payment, Shehan's lawful prebankruptcy repossession, and good faith efforts to return all the items that may have been in the car.  She credibly testified that she did not see any of the other items on the list.  The debtor regained possession of the Corolla using her own key while Shehan was in the bathroom.  The debtor deliberately avoided the most opportune time to inspect and determine if any contents were missing.  Further, and as stated above, it should not have been difficult to quickly discern if approximately $2100 in items were missing from inside a corolla and make that immediately known to Shehan.  The debtor gave Shehan no notice until a few weeks later.

Finally, the debtor's claimed damages—her testimony and her list of the cost to replace the items—is insufficient as a matter of law.

> The measure of damages for the conversion of personal property is the fair market value of the property at the time and place of the taking. *JAG Consulting v. Eubanks*, 77 Ark. App. 232, 72 S.W.3d 549 (2002). Fair market value is defined as the price the personalty would bring between a willing seller and a willing buyer in the open market after negotiations. *Id.* Evidence based upon purchase, replacement, or rental prices is improper. *Id.*

---

Jewelry ($200). The debtor exempted all of the above property.  These omissions may result in an order to appear and show cause.

*Midfirst Bank v. Sumpter*, 508 S.W.3d 69, 79 (Ark. Ct. App. 2016).  The debtor made no effort to provide a fair market valuation of the items, and the evidence she did provide was improper for this purpose.

The Complaint seeks attorney's fees and costs.  Notwithstanding the fact that the debtor did not meet her burden of proof for conversion, attorney's fees are not authorized in this instance. *Nat'l Hydro-Vac,* 314 B.R. at 767–68 (providing that "[a]ttorney's fees are not authorized by state law to the prevailing party in an action for conversion.").  The debtor's claim for damages and attorney's fees based on conversion is denied.

### 2a.  Contempt

The debtor also contends that Shehan should be held in contempt for her willful violation of a court order, i.e., her violation of the automatic stay imposed by 11 U.S.C. § 362.  According to the Eighth Circuit, "[c]ontempt is not a remedy for a violation of the automatic stay. Contempt is a remedy for violating court orders, not statutes." *Bugg v. Gray* (*In re Gray*), 519 B.R. 767, 771 (B.A.P. 8th Cir. 2014).  Rather, section 362(k) applies to damage awards for violation of the automatic stay.  *Sosne v. Reinert & Duree, P.C.* (*In re Just Brakes Corp. Sys., Inc.*), 108 F. 3d 881, 885 (8th Cir. 1997) ("[Section] 362(a), buttressed by § 105(a), confers broad equitable power to remedy adverse effects of automatic stay violations. . . . We conclude that Congress has conferred no power to punish for a violation of §362(a), other than the punitive damage authority in 362[(k)].").  Accordingly, the debtor's claim for contempt is denied.

### 2b.  Willful Violation of the Stay

Despite not having been pled, the proof argues for a claim under willful violation of the stay.  In *Young*, this court outlined the circumstances that give rise to a claim for willful violation of the automatic stay under 11 U.S.C. § 362(k).

Once a debtor files his petition, most collection activities against him are automatically stayed. 11 U.S.C. § 362(a), (c)(2) (2013). The automatic stay applies to all property of the estate until it ceases to be property of the estate and to the debtor until the case is closed or dismissed. 11 U.S.C. § 362(c)(1), (2) (2013). Section 362(a) imposes an affirmative duty on a creditor to cease actions that may violate the stay and requires the creditor to act affirmatively to reverse actions that would violate the stay. *See Walters v. Sherwood Mun. Ct.* (*In re Walters*), 219 B.R. 520, 526 (Bankr. W.D. Ark. 1998). A willful violation of the stay occurs when a creditor knew of the stay and a creditor's actions were intentional. *Id.* A creditor need not have a "specific intent to violate the automatic stay." *Id; See also Bateman v. Southern Development Corp.* (*In re Bateman*), 435 B.R. 600, 607 (Bankr. E.D. Ark. 2010) (citation omitted). A willful violation of the stay can result in actual damages, including costs and attorney's fees, as well as punitive damages "in appropriate circumstances." 11 U.S.C. § 362(k)(1) (2013).

*Young v. Young* (*In re Young*), 497 B.R. 904, 918 (Bankr. W.D. Ark. 2013). Thus, "[t]o prevail under § 362(k), the debtor must show: (1) the creditor violated the automatic stay; (2) the violation was willful; and (3) the debtor was injured by the violation." *Marino v. Seeley* (*In re Marino*), 437 B.R. 676, 678 (B.A.P. 8th Cir. 2010).

Based on this record, the court cannot conclude that Shehan willfully violated the stay with respect to any *contents*. To the extent Shehan may have violated the stay regarding the Corolla, the debtor presented no proof of any commensurate damages.

## V.   Conclusion

The debtor simply failed to meet her burden of proof that Shehan converted any personal property or that Shehan willfully violated the automatic stay concerning any contents. As to the contents, Shehan returned what she repossessed; the debtor introduced no proof as to any damages for any alleged delay in doing so. Accordingly, the relief requested in the Complaint is denied.

IT IS SO ORDERED.

Dated this 8th day of March, 2019.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:      Celesta K. Lawson, Debtor
         Linda Shehan, Defendant
         Jeremy Bueker, Attorney for Debtor
         Jack W. Gooding, Chapter 13 Standing Trustee